# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Pamela K.,

      Plaintiff,

v.

Kilolo Kijakazi, Acting Commissioner of
Social Security,

      Defendant.

Case No. 21-cv-690 (ECW)

**ORDER**

This matter is before the Court on Plaintiff Pamela K.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 18) and Defendant Acting Commissioner of Social Security Kilolo Kijakazi's ("Defendant" or "the Commissioner") Motion for Summary Judgment (Dkt. 24). Plaintiff filed this case seeking judicial review of a final decision by the Commissioner denying her application for disability insurance benefits. For the reasons discussed below, Plaintiff's Motion is granted in part and denied in part and Defendant's Motion is denied.

## I.      <u>BACKGROUND</u>

Plaintiff worked for Health Partners for 19 years, having last worked as a Certified Nursing Assistant in November 2017. (R. 363; *see also* R. 192 (disability report stating Plaintiff had worked as medical assistant for at least the last 15 years before becoming unable to work).) On March 13, 2018, Plaintiff filed a Title II application for Disability

Insurance Benefits, alleging disability beginning June 9, 2017.  (R. 67-68.)[1]  Her

application was denied initially and on reconsideration.  (R. 67-79, 81-92.)  Plaintiff filed

a written request for a hearing, and on August 26, 2019, Plaintiff appeared via video and

testified at a hearing before Administrative Law Judge Deborah Ellis ("ALJ").  (R. 33-66,

112-13.)  The ALJ issued an unfavorable decision on November 4, 2019, finding that

Plaintiff was not disabled.  (R. 14-24.)

Following the five-step sequential evaluation process under 20 C.F.R.

§ 404.1520(a),[2] the ALJ determined at step one that Plaintiff had engaged in substantially

gainful activity during the third quarter of 2017, but there had been a continuous 12-

month period during which the claimant did not engage in substantial gainful activity and

addressed that period in her decision.  (R. 19.)

---

[1]     The Social Security Administrative Record ("R.") is available at Docket Entries 17
and 17-1 to 17-11.

[2]     The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the
> claimant is presently engaged in a substantial gainful activity; (2) whether
> the claimant has a severe impairment that significantly limits the claimant's
> physical or mental ability to perform basic work activities; (3) whether the
> claimant has an impairment that meets or equals a presumptively disabling
> impairment listed in the regulations; (4) whether the claimant has the residual
> functional capacity to perform his or her past relevant work; and (5) if the
> claimant cannot perform the past work, the burden shifts to the
> Commissioner to prove that there are other jobs in the national economy that
> the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

At step two, the ALJ determined that Plaintiff had the following medically determinable impairments: depression, anxiety disorder, osteoarthrosis, and degenerative disc disease.  (R. 19.)  However, the ALJ also determined that Plaintiff did not have an impairment or combination of impairments that had significantly limited (or was expected to significantly limit) her ability to perform basic work-related activities for 12 consecutive months, and therefore, did not have a severe impairment or combination of impairments.  (R. 19-20.)  Consequently, the ALJ found Plaintiff had not been under a disability, as defined in the Social Security Act, from June 9, 2017, through the date of the ALJ's decision on November 4, 2019.  (R. 20-24.)

Plaintiff requested review of the decision, and the Appeals Council denied Plaintiff's request on January 19, 2021, making the ALJ's decision the final decision of the Commissioner.  (R. 1-5.)  Plaintiff then commenced this action for judicial review on March 12, 2021.  (Dkt. 1.)

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.  The Court will recount the facts of record only to the extent they are helpful for context or necessary for resolution of the specific issues presented in the parties' motions.

## II.    RELEVANT RECORD

### A.    Medical Record

On June 9, 2016, Plaintiff saw Dr. Jeffrey Mich, DPM, her podiatrist, concerning pain over the base of her left great toe, which was an ongoing problem that was progressively worsening.  (R. 271.)  Dr. Mich noted Plaintiff had undergone a fusion to

3

the same area of her right foot 15 years earlier.  (R. 271.)  Plaintiff's "Active Problem

List" identified osteoarthritis of both feet (severe), chronic pain of her neck and back due

to disc disease, chronic pain in her left foot due to a bunion and arthritis in her left thumb,

and degenerative joint disease of her cervical spine.  (R. 271-72.)  The range of motion of

the first metatarsophalangeal joint ("MTPJ") on her left foot was markedly restricted, and

an x-ray showed obvious degenerative changes throughout the first MTPJ with some mild

lateral deviation of the hallux, and other findings.  (R. 275.)  Dr. Mich assessed Plaintiff

with "[p]ainful hallux limitus left foot," and noted that she would need surgical

intervention on her left foot (as Plaintiff had previously undergone on her right foot), but

it was "entirely up to her as to when the area is bothering her enough to proceed" with

surgery.  (R. 275.)  Dr. Mich also said Plaintiff could try "some conservative treatment"

to "try and buy her some time until she can afford financially to proceed with surgery and

the required time off of work."  (R. 275.)

On July 18, 2016, Plaintiff saw Janet Siciliano, NP, for "foot problem, back pain

and medication management."  (R. 280.)  Plaintiff reported a constantly aching left foot

with varying levels of severity, and noted that "walking more, hours on feet makes it

worse," while pain medication, rest, elevation, ibuprofen, and ice provided some relief.

(R. 278.)  Her pain ranged from 4-5 out of 10 to 8+ out of 10 near the end of the week.

(R. 278.)  At times, her symptoms kept her from sleeping.  (R. 278.)  Plaintiff stated that

she worked full time, but reported that she would not be able to without medication, and

also reported that she could not walk or hike like she used to.  (R. 278.)  She had

previously undergone surgery on her right foot for a similar issue, and had tried physical

4

therapy, orthotics, and injections.  (R. 278.)  NP Siciliano refilled oxycodone,[3] 5 mg, "1-2 by mouth every 6 hours if needed for pain," and noted "NO risk factors for problems with opioid therapy" from a list of potential risk factors.[4]  (R. 279-80.)

On October 14, 2016, Plaintiff returned to NP Siciliano for a medication recheck, left foot pain, and back pain.  (R. 281.)  Plaintiff reported her primary pain was in her feet, but she had some back and neck pain as well.  (R. 281, 282.)  She again noted that her pain was "worse when working/on feet for long periods of time," and that rest, medications, and ice helped.  (R. 282.)  NP Siciliano noted: "There are NO risk factors for problems with opioid therapy from the list below" and prescribed hydrocodone-acetaminophen, 7.5-325 mg, "1 tablet by mouth every 6 hours if needed."  (R. 283-84.)

On March 3, 2017, Plaintiff saw NP Siciliano for a recheck of chronic pain management, blood pressure check, and labs.  (R. 286.)  Plaintiff was using orthotics and had obtained new, good shoes.  (R. 287.)  Again, Plaintiff reported pain in her left foot primarily, and in her neck and back.  (R. 288.)  She reported her pain had been 6 at worst and 1 at best over the last week and averaged 4-5 out of 10.  (R. 288.)  She explained her pain was worse when working on her feet for long periods of time, and her back pain increased with sitting in one position for a long time.  (R. 288.)  Rest, ice, medications,

---

[3]     Oxycodone is a narcotic used for pain management.  THE PILL BOOK, 823-24 (15th ed. 2012).

[4]     The risk factors were a distant history of substance abuse, active substance abuse, active mental illness, history of lost prescriptions, attempted early refill, self-escalation, sharing medication, obtaining from multiple providers, and previous broken pain medication contract.  (R. 279.)

heat, and Epsom baths helped.  (R. 288.)  Plaintiff walked some, but not as far as she

used to.  (R. 288.)  NP Siciliano again noted: "There are NO risk factors for problems

with opioid therapy from the list below."  (R. 288.)  She prescribed hydrocodone-

acetaminophen, 7.5-325 mg, "1 tablet by mouth every 6 hours if needed."  (R. 290.)

On June 5, 2017, Plaintiff saw NP Siciliano for pain management.  (R. 292.)

Again, Plaintiff reported pain in her left foot primarily, and in her neck and back.  (R.

292.)  She reported her pain had been 6 at worst and 1 at best over the last week and

averaged 4-5 out of 10.  (R. 292.)  She explained her pain was worse when working on

her feet for long periods of time, and her back pain increased with sitting in one position

for a long time.  (R. 292.)  NP Siciliano again noted: "There are NO risk factors for

problems with opioid therapy from the list below."  (R. 293.)  NP Siciliano prescribed

hydrocodone-acetaminophen, 7.5-325 mg, "1 tablet by mouth every 6 hours as needed.

(R. 293.)  Plaintiff was tearful at times during the visit, but had good eye contact and an

appropriate affect.  (R. 295.)  NP Siciliano diagnosed a moderate episode of recurrent

major depressive disorder and prescribed escitalopram oxalate (Lexapro)[5] 10 mg once

daily.  (R. 295.)

On October 6, 2017, Plaintiff saw NP Siciliano for pain management.  (R. 297.)

Plaintiff reported she had changed jobs to working at a pain clinic.  (R. 297.)  Plaintiff

also reported that her pain was worse since running out of medications and being out of

work for 2-3 months.  (R. 297.)  NP Siciliano noted: "Pain medication allows her to

---

[5]       Escitalopram oxalate (Lexapro) is a serotonin inhibitor used to treat depression.
THE PILL BOOK, 1204 (15th ed. 2012).

function and work." (R. 297.) Plaintiff reported pain in her left foot primarily, as well as in her right foot, neck, and back. (R. 297.) She reported her pain was worse when working on her feet for long periods of time and sitting in one position for a long time increased her back pain. (R. 297.) In the last week, her pain had ranged from 1 to 6 out of 10 and averaged 4-5 out of 10. (R. 297.) NP Siciliano diagnosed other chronic pain, osteoarthritis in the cervical spine and both feet, continued Plaintiff's pain medication prescription, and again noted no risk factors for opioids. (R. 298, 300.) Plaintiff was employed at the time of that visit. (R. 298.)

On December 27, 2017, Plaintiff was taken by ambulance for emergency department treatment after a fall and for dizziness, passing out (syncope), suspected seizure, and shaking and foaming at the mouth. (R. 309-10, 313.) On examination, she had a normal range of motion and tenderness along the left lateral cervical spine region. (R. 311.) Her mood, memory, affect, and judgment were normal. (R. 311.) She ambulated without difficulty when discharged. (R. 305.)

Plaintiff saw NP Siciliano for pain management on February 7, 2018 (R. 334-38); May 7, 2018 (R. 351-56); October 31, 2018 (R. 501-07); and March 11, 2019 (R. 565-82). Plaintiff was no longer employed as of her February 7, 2018 visit, and remained unemployed. (R. 335, 352, 501, 567.) She was walking some when wearing certain shoes and inserts. (R. 335.) She reported pain primarily in her left foot, but some in her right foot, neck, and back, at each visit. (R. 334, 351, 501, 567.) At each of those visits, she also reported that her pain was worse when working or on her feet for long periods of time and that sitting in one position for a long time increased her back pain. (R. 335, 351,

501, 567.)  At each of those visits, she reported "[r]are episodes of severe pain that limit[]

walking."  (R. 335, 351, 501, 567.)  At her May 7, 2018 visit, Plaintiff reported new pain

in her mid and lower right back as well as her ongoing left foot, neck, and back pain.  (R.

351.)  At her October 31, 2018 visit, she reported that her "left thumb arthritis [was]

bothering her now as well."  (R. 501.)  At her March 11, 2019 visit, Plaintiff reported that

her moods had not been great, she was unemployed, she was being seen at Nystrom &

Associates, and she was having bad migraines.  (R. 567; *see* R. 665-70 (notes from first

visit to Nystrom & Associates on February 18, 2019).)  Her back pain was worse, but her

feet were "better since she was not on them that much."  (R. 567.)  At each of those

visits, Plaintiff reported that rest, ice, medication, heat, Epsom baths, and ibuprofen

provided some relief, and as of her May 7, 2019 visit, a TENS unit was helping with her

back pain.  (R. 335, 351, 501, 567.)  The progress reports indicate "NO" red flags for

opioids at the May 7, 2018; the October 31, 2018; or the March 11, 2018 visits, although

her March 11, 2019 visit noted Plaintiff was "working on alcohol issues" and had an

active mental illness.  (R. 352, 502, 568.)

NP Siciliano also reported the following objective findings for Plaintiff at the

March 11, 2019 visit:

> NECK/back:
> Tenderness: both cervical and lumbar para-spinous muscles.
> Spasm: same as above.
> ROM: Intact
> normal dtr's in upper extremities.  Good rom with no weakness, good hand
> grasp.

(R. 571.)  NP Siciliano also noted "[b]ecause [Plaintiff] is not on her feet anymore, and her primary pain had been in her feet, will begin tapering medications."  (R. 572.)

Plaintiff began seeing Licensed Clinical Social Worker ("LICSW") Amber Schneider at Nystrom & Associates on February 18, 2019.  (R. 665-70.)  She reported she had not worked in more than a year due to her mental health, was struggling to do anything, and that she was applying for disability for mental health and chronic pain.  (R. 665.)  She also reported depressive, anxiety, panic, and Post-Traumatic Stress Disorder ("PTSD") symptoms and was assessed with PTSD and depression.  (R. 665, 667-68.) LICSW Schneider recommended individual therapy as well as adult rehabilitative mental health services and adult day treatment to help Plaintiff learn skills to manage her symptoms.  (R. 669-70.)  Plaintiff's mental status exam showed that she was oriented to time, person, place, and situation; she had normal eye contact; she was well-groomed; her speech was of normal rate and rhythm; her attitude was cooperative; her mood was normal; her affect was appropriate; her thought content was logical; her attention span/concentration was focused; and she denied suicidal ideation and homicidal ideation. (R. 669.)  Plaintiff continued to see LICSW Schneider, including on March 7, 2019; March 14, 2019; April 3, 2019; April 10, 2019; May 7, 2019; May 14, 2019; May 24, 2019; May 28, 2019; June 5, 2019; June 25, 2019; July 2, 2019; July 18, 2019; July 30, 2019; August 15, 2019; and August 20, 2019.  (R. 671-76, 697-702, 709-16.)

On April 29, 2019 and May 3, 2019, Plaintiff saw Daniel Moore, DC, for chiropractic treatment of neck, back, and shoulder pain.  (R. 378-80.)  DC Moore

observed tenderness, stiffness, and muscle spasms.  (R. 378-79.)  Plaintiff saw DC Moore

again on May 14, 2019; May 22, 2019; May 24, 2019; and June 5, 2019.  (R. 373-76.)

On May 3, 2019, Plaintiff saw Kami Simmons, DNP, to establish psychiatric care.

(R. 692.)  DNP Simmons assessed Plaintiff with depression, major, recurrent, moderate,

and PTSD.  (R. 692.)  She explained that Ativan,[6] which had been prescribed by

Plaintiff's primary care provider, should not be increased due to her pain medications,

and instead recommended a trial of Cymbalta.[7]  (R. 692.)

On June 6, 2019, Plaintiff saw DNP Simmons for psychiatric medication

management.  (R. 703.)  Plaintiff had stopped Cymbalta due to side effects, and reported

worsening mood and poor concentration and low energy.  (R. 704-05.)  DNP Simmons

prescribed Vibryd[8] and discontinued Cymbalta.  (R. 708.)  Plaintiff requested an

emotional support animal letter.  (R. 708.)

On June 27, 2019, NP Siciliano saw Plaintiff for pain medication management.

(R. 637-47.)  Plaintiff again reported feet, back, neck, and left thumb pain, said she had

"more pain than usual" because she had started a garden, and said she was using her

TENS unit.  (R. 638-39.)  She was receiving psychiatric care and therapy at Nystrom &

Associates "for moods," and mentioned that she was seeing a chiropractor.  (R. 638.)  No

---

[6]     Ativan is an anti-anxiety medication.  THE PILL BOOK, 157-58 (15th ed. 2012).

[7]     Cymbalta is used to treat depression and anxiety.  THE PILL BOOK, 1045-46 (15th ed. 2012).

[8]     Vibryd is a "Serotonin Partial Agonist and Reuptake Inhibitor for the Treatment of Major Depressive Disorder."  NIH National Library of Medicine, https://www.ncbi.nlm. nih.gov/pmc/articles/ PMC3278186/ (last visited July 18, 2022).

risk factors were noted for opioids, but Plaintiff had been "taking more recently due to issues." (R. 639.) An objective exam revealed:

> NECK:
> Tenderness: +--posteriorly from mastoid, into trapezious [sic] region.
> Spasm: same as above.
> ROM: Intact
> normal dtr's in upper extremities. Good rom with no weakness, good hand grasp.
>
> BACK:
> Inspection: normal
> Tenderness: mild lumbar
> Spasm: mild
> ROM: intact
> Toe walks and heal [sic] walks without difficulty.
> Negative straight leg raises.
> Normal dtr's in lower extremities. No weakness/foot drop.

(R. 643.)

## B.    Administrative Findings and Medical Opinions

On May 7, 2018, Plaintiff saw Donald Wiger, PhD, LP, for a psychological consultative examination. (R. 266.) Plaintiff reported panic attacks 3-4 times a month, which lasted about 15-20 minutes, intermittent depression, and no suicidal tendencies. (R. 266.) Dr. Wiger noted that it was difficult collecting specific information about Plaintiff's current impairments, as Plaintiff often responded to questions in the past tense (R. 266), and described her as an "excessive historian" who was "fairly guarded" (R. 267). He reported no evidence of a thought disorder, a normal affect, and no evidence of a personality disorder. (R. 268.) Dr. Wiger's "Medical Sources Statement" was as follows:

> Based on this psychologist's findings, [Plaintiff] is able to understand and follow directions. She is able to sustain attention and concentration. She is able to carry out mental tasks with reasonable persistence and pace. She relates variably with coworkers and supervisors. She is able to handle the emotional stressors of at least an entry-level workplace.

(R. 269.)

On May 10, 2018, the initial determination identified Plaintiff's (1) osteoarthritis and allied disorders and (2) disorders of back (discogenic and degenerative) to be severe medically determinable impairments.  (R. 73.)  Mattias Jordan, MD, a state agency medical consultant, reviewed Plaintiff's June 9, 2016 visit with Dr. Mich; June 5, 2017 visit with NP Siciliano; the records of Plaintiff's December 27-28, 2017 hospital visit and discharge summary, which included a report that Plaintiff had a "normal range of motion" and was "[a]mbulating without difficulty"; and the March 9, 2018 hospital follow-up visit with NP Siciliano, where Plaintiff was ambulatory, well-appearing, and diagnosed with chronic pain.  (R. 71.)  The Functional Limitations section indicated that Plaintiff went for walks, went to the park, did some chores, and went to AA meetings with her boyfriend.  (R. 72.)  Dr. Jordan assigned Plaintiff exertional, postural, and environmental limitations.  (R. 76-78.)

Also at the initial level, the Medically Determinable Impairments and Severity section of the initial determination identified Plaintiff's "Depressive, Bipolar and Related Disorders" and "Anxiety and Obsessive-Compulsive Disorders" as "Severe."  (R. 73.) However, Mera Kachgal, PhD, LP, after noting Plaintiff's allegations of depression and

anxiety and NP Siciliano's prescription for Plaintiff's depression,[9] reviewed the results of

Dr. Wiger's consultative examination and various mental status exams, as well as

Plaintiff's reported activities of daily living, and concluded that "[e]vidence in file

suggests the claimant's mental health impairments are nonsevere." (R. 74.)

On August 1, 2018, Plaintiff saw A. Neil Johnson, MD, for a consultative

examination. (R. 363-66.) Plaintiff reported problems with her back, neck, feet, high

blood pressure, and migraines. (R. 363.) Dr. Johnson noted Plaintiff's report of chronic

neck and back pain since car accidents in 2006; that a CT scan revealed spondylosis in

Plaintiff's neck; and that Plaintiff had a lot of soft tissue tenderness, which he thought

appeared to be more of a myofascial pain. (R. 365.) Dr. Johnson also reported that

Plaintiff was having a migraine headache that morning. (R. 363.) He observed that she

was walking normally without an assistive device. (R. 364.) On physical examination,

Dr. Johnson noted "certainly severe tenderness to the soft tissue of the neck and mild to

moderate tenderness in a localized area over the lumbar spine at about L2-L3." (R. 364.)

She had full use of her hands and normal range of motion except for a "slight loss of

motion of the neck." (R. 364-65.) As part of Plaintiff's consultative examination, an x-

ray was performed which showed grade I anterior slippage of the L5 segment on S1,

which probably represented spondylolisthesis; "satisfactory" vertebral height; and mild

---

[9] The initial determination describes this prescription as Celexa and refers to
Plaintiff's June 5, 2017 visit with NP Siciliano (R. 70, 71), but NP Siciliano prescribed
Lexapro, not Celexa, on June 5, 2017 (R. 295).

narrowing of the lumbosacral disc space without end plate spurring or eburnation.  (R. 369.)  Dr. Johnson did not opine on any functional limitations.  (*See* R. 363-71.)

At the reconsideration level, on August 17, 2018, Shayne Small, MD, considered Plaintiff's May 7, 2018 visit with NP Siciliano, at which Plaintiff was ambulatory, and her August 1, 2018 orthopedic consultative examination with Dr. Johnson, noting that the "CT scan of the neck showed no fracture, but spondylosis";  as well as Dr. Johnson's findings of a "full range of motion of the back"; a "slight loss of motion of the neck"; "a lot of soft tissue tenderness," which appeared to be myofascial pain; and no evidence of radiculopathy.  (R. 85.)  As to Plaintiff's lumbar spine, Dr. Small noted the August 1, 2018 CT showed a grade I anterior slippage of the L5 segment on S1, which "probably represents spondylolisthesis"; "satisfactory" vertebral height; and mild narrowing of the lumbosacral disc space without end plate spurring or eburnation.  (R. 85.)  He further noted that Plaintiff's remaining disc spaces were well maintained, and there were no abnormalities affecting the posterior elements of sacroiliac joints.  (R. 86.)  Dr. Small noted that while Plaintiff alleged new back pain on reconsideration, the consultative exam reported chronic pain, a normal gait, only mild changes in the lumbar spine x-ray, and a normal range of motion except being mildly decreased at the cervical spine.  (R. 91.)  The reconsideration determination identifies Plaintiff's (1) osteoarthritis and allied disorders and (2) disorders of back (discogenic and degenerative) to be severe medically determinable impairments, and Dr. Small assigned Plaintiff exertional, postural, and environmental limitations.  (R. 89-91.)

As to Plaintiff's mental impairments, the reconsideration determination again identified Plaintiff's "Depressive, Bipolar and Related Disorders" and "Anxiety and Obsessive-Compulsive Disorders" as "Severe."  (R. 86.)  Ray M. Conroe, Ph.D., L.P., however, affirmed Dr. Kachgal's conclusion that Plaintiff's mental health impairments were nonsevere as consistent and persuasive.  (R. 87.)

On March 11, 2019, NP Siciliano completed a medical opinion form.  (R. 372.) She diagnosed Plaintiff with depression and anxiety, osteoarthritis of feet, degenerative joint disease of the cervical spine, and headaches.  (R. 372.)  She identified poor concentration and motivation as temporary physical or mental conditions and no permanent limitations.  (R. 372.)  As for whether Plaintiff could work in the foreseeable future, NP Siciliano stated "depends on response from treatment."  (R. 372.)

On April 23, 2019, Plaintiff saw Carrie LeBarron, PhD, for psychological testing. (R. 677-91.)  She reported enjoying sewing, boating, jet-skiing, reading, and walking her dog.  (R. 678.)  Plaintiff described her medications as working well.  (R. 677.)  The Million Clinical Multiaxial Inventory, Fourth Edition, indicated that Plaintiff may have difficulty with social situations and that Plaintiff "may" exhibit a number of behaviors, including rage-filled outbursts, mistaking a minor slight for a major insult, and jumping the gun with impulsive hostility, which "may also upset her capacity to cope effectively with everyday tasks."  (R. 686-87.)  Dr. LeBarron summarized the results as "suggest[ing] consideration for diagnoses of Major Depressive Disorder, Somatic Symptom Disorder, Generalized Anxiety Disorder, and substance use."  (R. 689.)  The results of the Minnesota Multiphasic Personality Inventory, Second Edition, did not

suggest any clinical diagnoses, instead indicating Plaintiff appeared to exhibit traits of a personality disorder.  (R. 689.)

On June 13, 2019, Dr. Simmons provided opinions concerning Plaintiff's limitations.  (R. 381.)  Dr. Simmons opined Plaintiff had "certain limitations with managing and coping with social interactions, stress, and anxiety."  (R. 381.)  Dr. Simmons recommended an assistance animal and opined that Plaintiff met the definition of disability under various non-SSA programs.  (R. 381.)

## C.   Plaintiff's Reports and Testimony

Plaintiff applied for social security disability insurance benefits on March 13, 2018.  (R. 67-68.)  On March 30, 2018, she completed her initial disability report, reporting the following conditions limited her ability to work: osteoarthritis (multiple joints); severe joint degermation (left foot); disc herniation with spondylosis (neck and back); depression; and anxiety.  (R. 190.)  She stated that her depression and anxiety worsened due to work issues; frequent walking on the job worsened her foot pain; and pushing wheelchairs, lifting, and bending at work aggravated her back problems.  (R. 196.)

On April 12, 2018, Plaintiff completed a function report.  (R. 201.)  She stated that she had hallux limitus of her left foot, which was very painful and made it difficult to walk for long periods, as well as osteoarthritis in both feet and her cervical spine.  (R. 201.)  Plaintiff reported that she found it difficult to sit for long periods due to back pain and she developed anxiety and depression due to chronic pain.  (R. 201.)  She reported that she could make coffee, watch the news, read, order groceries so she did not have to

carry them, fix herself food, get mail, take short walks, and feed the birds. (R. 202.) She reported that due to her impairments, she could no longer: go dancing, play frisbee, travel, walk for charitable causes, get her own groceries, camp, ride a bike, or wash her car. (R. 202.) She also reported poor sleep. (R. 202.) She said her ability to prepare meals and engage in house and yard work was limited by her impairments. (R. 203-04.) Plaintiff reported limitations in lifting, bending, standing, reaching, walking, sitting, stair climbing, completing tasks, concentration, and using her hands. (R. 205.) She reported watching movies, taking boat rides, reading, scrapbooking, and "plays" as hobbies and interests, and explained generally: "my activities are more sedentary now." (R. 206.) Plaintiff said she had orthotic inserts in her shoes and a TENS unit for her back and reported her medications include Vicodin for pain, lorazepam for anxiety, and escitalopram for depression. (R. 207-08.)

On May 18, 2018, Plaintiff completed a disability report explaining that she had new mid-back pain since her last report. (R. 224; *see* R. 351 (NP Siciliano's May 7, 2018 progress notes reporting new mid- and lower-back pain on the right).)

At the hearing, Plaintiff testified that the main reason she couldn't work was because:

> Well, my feet or my left foot has gotten really bad. It's unstable. I have taken some nasty falls. One year I ended up getting a handicap sticker, and I'm going to ask for one, again this year. So, the walking part of it and also the sitting because of my herniated discs with nerve impingement, I can't sit for long periods of time.

(R. 40-41.) Plaintiff testified that she had been terminated from her last job while she was on FMLA leave, which she was on for her feet, back, and neck, and then for

depression and stress-related panic attacks. (R. 41-42.) Plaintiff also testified that she had been having a great deal of pain in her feet and could not walk, and sometimes her arms were numb and painful, so she would require FMLA leave, and that she saw a chiropractor for neck issues, which also related to her arm issues, and took pain medication. (R. 43-44.)

## III.   <u>LEGAL STANDARD</u>

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g), or if the ALJ's decision resulted from an error of law. *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing 42 U.S.C. § 405(g); *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)). "'Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's conclusions.'" *Id.* (quoting *Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007)). The Court "considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Id.* "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* (citation omitted). In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004). Assessing and resolving credibility is a matter properly within the purview of the ALJ. *See Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (citing *Edwards v. Barnhart*, 314 F.3d 964,

966 (8th Cir. 2003) ("Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide.").

## IV.   DISCUSSION

Plaintiff argues that the ALJ made two errors:  First, the ALJ erred by finding Plaintiff's impairments individually or in combination were non-severe, and second, that the Commissioner's removal protections violated the separation of powers, resulting in an unconstitutional denial of benefits.  (Dkt. 19 at 20, 30.)  Because, as set forth below, the Court concludes that the ALJ erred in finding Plaintiff's impairments, individually or in combination, were non-severe, the Court does not reach Plaintiff's separation of powers argument.

## A.   The ALJ's Non-Severity Findings

### 1.   The Parties' Arguments

Plaintiff contends that the ALJ applied too stringent a standard when finding Plaintiff's medical impairments relating to her foot, neck, and back pain, as well as her mental impairments, were non-severe.  (Dkt. 19 at 20-30.)  Plaintiff argues the ALJ applied too stringent a standard for finding severity, summarizes the ALJ's findings, argues that the ALJ did not fairly develop the record as to Plaintiff's decision to use pain medication (rather than surgery) to treat her left toe, challenges the ALJ's decision to reject the prior administrative findings of severity, and challenges the ALJ's decision to discount the medical opinions as to Plaintiff's mental impairments.  (*Id.* at 20-29.)

Plaintiff further contends that:

> Finally, the ALJ at hearing devoted much time to [Plaintiff's] alcohol use and potential prescription opiate misuse—drawing conclusions at [the] hearing which were just not well supported in the record and contrary to Ms. Siciliano's treatment notes finding there were no contraindications to prescribing opiates for much of the relevant period and Ms. Siciliano's decision to prescribe opiates for the entire relevant period.

(*Id.* at 29.)  According to Plaintiff, "[t]here just was not a significant issue with improper pain medication use in this record," moreover, "drug and alcohol abuse is only evaluated in a potentially adverse manner to the claimant at Steps 3 and 5 of the sequential evaluation process, as those are the only steps at which a claimant can otherwise be found disabled."  (*Id.*)  Plaintiff asks the Court to remand Plaintiff's claim with instructions for the ALJ to apply the correct standard at step two and then proceed with the sequential evaluation process.  (*Id.* at 30.)

Defendant responds that "Plaintiff's minimal treatment, mild medical diagnostics, activities, refusal of treatment, and work activity show that she did not have a severe physical impairment" (Dkt. 25 at 21) and that Plaintiff's activities of daily living, "noncompliance with treatment recommendations," and medical records relating to her left foot, neck, and back constitute substantial evidence supporting the ALJ's conclusion that her foot, neck, and back impairments were non-severe (*id.* at 21-26).  As to Plaintiff's mental impairments, Defendant argues that the ALJ was not required to address mild ratings at step two (*id.* at 26), and the ALJ's findings of mild limitation in concentrating, persisting, or maintaining pace were supported by substantial evidence, including the prior administrative findings (*id.* at 26-28).  Defendant contends that

Plaintiff did not "dispute" the "relevant reports" supporting the ALJ's mild ratings, rendering that issue "waived." (*Id.* at 27; *see also id.* at 25-26 n.6 (arguing Plaintiff waived any challenge to the ALJ's assessment of her subjective complaints).) Finally, Defendant responds that "substance abuse" was not material to the ALJ's decision and the ALJ was not required to perform a materiality analysis as to "substance abuse." (*Id.* at 28-29.)

In her reply to these arguments, Plaintiff contends that the cases cited by Defendant in connection with the step two argument "are not step two denial cases and are not instructive for addressing the issue argued in this case." (Dkt. 26 at 3.) Plaintiff further contends:

> All of the cases the Commissioner cited in Section IIA of the Commissioner's brief are inapplicable to Plaintiff's case—these cases found severe impairments at step two and proceeded with the sequential evaluation process. That the Commissioner could only cite to non-step two denial cases confirms what Plaintiff argued in principal briefing, [Plaintiff's] claim should have proceeded to steps three through five of the sequential evaluation process.

(*Id.* at 4 (footnote omitted).)

Plaintiff notes again that the "agency medical consultants found Plaintiff had severe impairments and limitations." (*Id.* at 5.) Specifically, as to her feet, back, and neck, Plaintiff argues:

> [Plaintiff] explained her feet issues and other impairments would preclude performing even light exertional jobs. (*See* TR 40-41). Looking narrowly at just her feet issues, leading up to the relevant period, [Plaintiff] saw a podiatrist, Dr. Jeffrey Mich, DPM, about her foot issues. (TR 271-75). She was going to need surgical intervention for this. (TR 275). The pain was aggravated by being on her feet at work, as clear in this record. (TR 277). [Plaintiff] proceeded with pain management instead of surgery for her left

foot to try and continue working on her feet—but she still needed left foot surgery. (*See* TR 292). Her combination of impairments limited her activities and made her more sedentary. (TR 206). She sought consistent pain management treatment throughout the record for her various impairments, and again, had ongoing foot pain that was limiting her ability to perform standing and walking. (*See* TR 501, 505). When [Plaintiff] was no longer working and not on her feet much, she had less pain—but that did not mean [Plaintiff's] feet issues did not impact her ability to perform the standing and walking of fulltime competitive light or medium exertional level work. (*See* TR 567).

(*Id.* at 6.)

Plaintiff also cites pages 23-30 of her opening brief as "walk[ing] through the ALJ's findings and explain[ing] why the findings were not supported by substantial evidence or otherwise not sufficient to deny [Plaintiff's] claim at step two." Plaintiff then states: "There is no waiver here and the Commissioner should stop making frivolous waiver/issue exhaustion arguments." (*Id.* at 5.)

Plaintiff suggests that the ALJ found her foot, neck, and back issues non-severe because "if [Plaintiff] had any significant limitations in standing or walking or if she was limited to lifting less than the amount required for medium exertional work, in addition to mental limitations precluding transferable skills, Plaintiff was disabled." (*Id.* (footnote omitted).) Finally, Plaintiff, referring to the ALJ's questioning regarding her prescription drug and alcohol usage at the hearing, states: "One may wonder to some degree if the oddly contentious hearing contributed to the unusual way the ALJ treated Plaintiff's claim in the hearing decision."[10] (*Id.* at 6.)

_____

[10]   The ALJ's questioning on this topic spanned several pages and ended when the ALJ said she was "not going to argue with [Plaintiff]" about whether Plaintiff was "mixing" her prescribed drugs "against the advice of her doctors." (*See* R. 44-55.)

22

## 2.      The ALJ's Reasoning

As the ALJ recognized, Plaintiff:

[A]lleges osteoarthritis, severe joint degeneration of the left foot, disc herniation with spondylosis, depression and anxiety (2E/2). Due to these conditions, she reports difficulty with a range of activities (4E, Testimony). For instance, she reports that it is difficult to walk or sit for long periods (4E/1). In addition, she alleges that her conditions affect her ability to lift, bend, stand, reach, climb stairs, complete tasks and use her hands (4E/5). Finally, she specifies that she can pay attention for one hour (4E/5).

(R. 20-21.)

The ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms but that her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in the decision.  (R. 21.)  Specifically, the ALJ explained:

In August 2018, the claimant underwent a consultative orthopedic examination, where she complained of chronic back and neck pain caused by two car accidents in May and October 2006 (4F/1). However, she has never had surgery on her back or neck, and a computer tomography (CT) scan of the cervical spine showed no fracture, only spondylosis (2F/58, 4F/1, 3). X-ray scans of the lumbar spine also revealed only a grade I anterior slippage of the fifth lumbar vertebrae and mild narrowing of the lumbosacral disc space (4F/7). Furthermore, she displayed full range of motion of the back and only a slight loss of motion of the neck, walked normally without an assistive device and demonstrated full motor strength, sensation and reflexes in all extremities (4F/3).

At an office visit in June 2019, the claimant exhibited mild lumbar tenderness, but she also toe and heel-walked without difficulty, produced negative bilateral straight leg raise tests, exhibited normal reflexes in all extremities and demonstrated intact range of motion in both her back and her neck (8F/262).

The claimant underwent arthrodesis of the right first toe in 2000 (4F/1) that has remained stable (2F/5). She has also been diagnosed with hallux limitus of the left foot (2F/1). Although she has been offered surgery for this condition, she has hesitated to consult a podiatrist and instead favors pain medication (2F/38, 8F/124).

Finally, it is noted that, at a psychological examination, the claimant reported that she enjoys boating, jet-skiing and walking her dog (9F/14). She has also reported walking or gardening at other examinations (9F/11, 12, 33, 35, 47, 49).

(R. 21.)

With respect to prior administrative findings and medical opinions, the ALJ stated:

The undersigned [finds] unpersuasive the prior administrative findings of State agency medical consultants Matthias Jordan, M.D. (1A/6-7, 10-12) and Shayne Small, M.D. (3A/9-11), who reviewed the medical record in May and August 2018, respectively. Both consultants found that the claimant is capable of medium exertion work with additional postural and environmental limitations (1A/10-11, 3A/9-10). While their findings are supported by synopses of the medical record at the time of their respective reviews (1A/7, 3A/11), neither consultant provides any explanation for the recommended limitations. Furthermore, their findings are inconsistent with the claimant's negative bilateral straight leg raise tests, normal reflexes in all extremities and demonstration [sic] intact range of motion in both her back and her neck in June 2019 (8F/262). Due [to] the lack of support from or consistency with the medical record, the findings of Dr. Jordan and Dr. Small are deemed unpersuasive.

(R. 22-23.)

### 3.   Analysis

As the Eighth Circuit noted in *Hudson v. Bowen*, the U.S. Supreme Court has held that "[o]nly those claimants with slight abnormalities that do not significantly limit any 'basic work activity' can be denied benefits [at step two]." 870 F.2d 1392, 1395-96 (8th Cir. 1989) (quoting *Bowen v. Yuckert*, 482 U.S. 137, 158 (1987)). Accordingly, "the sequential evaluation process can be terminated at step two only in cases where there is

no more than a minimal effect on the claimant's ability to work." *Id.* at 1396. As the

ALJ noted:

> Basic work activities are the abilities and aptitudes necessary to do most jobs.
> Examples of these include:
>
> 1.  Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
>
> 2.  Capacities for seeing, hearing, and speaking;
>
> 3.  Understanding, carrying out, and remembering simple instructions;
>
> 4.  Use of judgment;
>
> 5.  Responding appropriately to supervision, co-workers, and usual work situations; and
>
> 6.  Dealing with changes in a routine work setting (SSR-85-28).

(R. 20.)

> According to the Eighth Circuit:
>
> If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two. It is the claimant's burden to establish that his impairment or combination of impairments are severe. Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard, and [the Eighth Circuit has] upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing.

*Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007) (cleaned up).

As discussed above, in finding Plaintiff's physical impairments non-severe, the

ALJ found unpersuasive the prior administrative findings of Dr. Jordan and Dr. Small,

who found the Plaintiff "is capable of medium exertion work with additional postural and

environmental limitations." (R. 22.)

With respect to the ALJ's evaluation of Dr. Jordan's and Dr. Small's findings, because Plaintiff's claim was filed after March 27, 2017, the applicable regulation is 20 C.F.R. § 404.1520c.  *See Pa M. v. Kijakazi*, Civ. No. 20-741 (BRT), 2021 WL 3726477, at *6 n.7 (D. Minn. Aug. 23, 2021) ("Since Plaintiff's claim was filed after March 27, 2017, § 404.1527 does not apply because § 404.1520c supersedes any previous statutory requirements.") (citing 20 C.F.R. § 404.1520c).  Pursuant to § 404.1520c,

> [An ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources.  When a medical source provides one or more medical opinions or prior administrative medical findings, [the ALJ] will consider those medical opinions or prior administrative medical findings from that medical source together using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.  The most important factors [an ALJ] consider[s] when [the ALJ] evaluate[s] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section).

20 C.F.R. § 404.1520c(a).  The ALJ must "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings" in the determination or decision.  20 C.F.R. § 404.1520c(b)(2).

Here, the ALJ found that Dr. Jordan's and Dr. Small's "findings [we]re supported by synopses of the medical record at the time of their respective reviews."  (R. 22.) However, the ALJ discounted their findings because "neither consultant provides any explanation for the recommended limitations."  (R. 22.)  It is unclear what explanation the ALJ sought but did not find, given that both Dr. Jordan and Dr. Small summarized the records they were relying on (R. 71-72 (Dr. Jordan), R. 85-86 (Dr. Small)) and provided

some explanation as well (R. 73 (Dr. Jordan), R. 88, 91 (Dr. Small).)  Moreover, the ALJ found Dr. Kachgal's and Dr. Conroe's prior administrative findings of non-severity persuasive without identifying any "explanation" that supported their conclusions.  (*See* R. 23 (discussing consistency and supportability).)

Perhaps more importantly, the ALJ also found Dr. Jordan's and Dr. Small's findings unpersuasive because they were "inconsistent with the claimant's negative bilateral straight leg raise tests, normal reflexes in all extremities and demonstration [sic] intact range of motion in both her back and her neck in June 2019 (8F/262)."  (R. 23.)  The ALJ thus concluded: "[d]ue [to] the lack of support from or consistency with the medical record, the findings of Dr. Jordan and Dr. Small are deemed unpersuasive."  (R. 23.)

There are several problems with this reasoning.  First, the ALJ's conclusion at the end of this paragraph that there was a "lack of support from . . . the medical record" (R. 23) is contradicted by her earlier statement (in the same paragraph) that Dr. Jordan's and Dr. Small's findings were "supported by synopses of the medical record at the time of their respective reviews" (R. 22).  The ALJ did not identify any lack of support from any medical records existing at the time Dr. Jordan reviewed the record in May 2018 or Dr. Small reviewed the record in August 2018.

Second, the ALJ found that Dr. Jordan's and Dr. Small's opinions were inconsistent with "negative bilateral straight leg raise tests, normal reflexes in all extremities and demonstration [sic] intact range of motion in both her back and her neck in June 2019." (R. 23.)  Earlier in her decision, the ALJ also noted similar objective

27

findings of "only a slight loss of motion of the neck," walking normally without an

assistive device, and full motor strength, sensation, and reflexes.  (R. 21.)  The ALJ

further noted that Plaintiff "favors pain medication" over surgery.[11]  (R. 21.)  The ALJ

did not,  however, cite any administrative finding or medical opinion that supported her

conclusion that Plaintiff's physical impairments were non-severe.  Rather, the ALJ's

rejection of Dr. Jordan's and Dr. Small's findings was based on the ALJ's interpretation

of the medical record, specifically, that the results of certain physical examinations were

inconsistent with Dr. Jordan's and Dr. Small's conclusions.  The Eighth Circuit has

concluded that "remand is necessary" when "the ALJ erred in relying on his own

inferences as to the relevance of the notations 'no acute distress' and 'normal movement

of all extremities' when determining the relative weight to assign to [the state agency

medical experts] opinions."  *Combs v. Berryhill*, 878 F.3d 642, 647 (8th Cir. 2017).

Moreover, the ALJ appears to have substituted her own judgment for Dr. Small's medical

judgment, as one of the medical records the ALJ reviewed and found inconsistent with

Dr. Small's opinion is the August 2018 consultative orthopedic examination that Dr.

Small expressly considered.  (R. 21 (discussing August 2018 consultative orthopedic

examination); R. 85 (considering "Ortho CE" dated August 1, 2018).)  As for the June

27, 2019 examination, as Plaintiff noted, the ALJ did not address the objective findings

of back and neck tenderness and spasm when concluding those examination results were

---

[11]     The ALJ did not identify Plaintiff's decision to treat with pain medication rather
than surgery as a reason for discounting Dr. Jordan's and Dr. Small's administrative
findings.  (*See* R. 22.)

inconsistent with Dr. Jordan's and Dr. Small's opinions.  (R. 23; *see* Dkt. 19 at 24-25.)

"'An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding.'"  *Thesing v. Colvin*, No. CIV. 13-1079 JRT/JSM, 2014 WL 3890372, at *26 (D. Minn. Aug. 8, 2014) (quoting *Denton v. Astrue*, 596 F.3d 419, 426 (7th Cir. 2010) (citation omitted)).

The Court recognizes that "[i]f substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome," *Nash*, 907 F.3d at 1089 (quoting *Travis*, 477 F.3d at 1040), and that "the Court may not substitute its own judgment or findings of fact for that of the ALJ," *see Hilkemeyer*, 380 F.3d at 445.  The Court further recognizes that, for example, when the ALJ formulates the residual functional capacity ("RFC") at step four, "there is no requirement that an RFC finding be supported by a specific medical opinion."  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)).  But "an ALJ must not substitute [her] opinions for those of the physician."  *Combs*, 878 F.3d at 647.  In finding that Plaintiff's physical impairments, namely, her foot, neck, and back problems, had no more than a minimal effect on Plaintiff's ability to perform physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling, the ALJ drew her own inferences about Plaintiff's functional abilities from the results of certain objective medical examinations.  The ALJ's exercise of medical judgment when finding Plaintiff's

physical impairments non-severe is impermissible, particularly when the state agency medical consultants had similar physical examination findings before them, yet reached a contrary result.[12]  *See Combs*, 878 F.3d at 647 ("Although Combs' medical providers consistently note in their treatment records that Combs has a normal range of motion, they likewise consistently diagnose her with rheumatoid arthritis, prescribe medications for 'severe pain,' and note 'trigger point' and 'joint pain with' range of motion.  By relying on his own interpretation of what 'no acute distress' and 'normal movement of all extremities' meant in terms of Combs' RFC, the ALJ failed to satisfy his duty to fully and fairly develop the record.").

Indeed, U.S. Magistrate Judge Tony N. Leung recently addressed similar reasoning by an ALJ when the ALJ rejected the state agency medical consultants' findings imposing limitations as to reaching and fingering based on the ALJ's own interpretation of "clinical findings of only minimal swelling, lack of noted severe intrinsic muscle atrophy on the right (as opposed to the left), and reported significant improvement of right wrist pain with rehabilitation" and because "the evidence indicate[d] that [Plaintiff] has restrictions in handling and fingering on the left as well as the right, given the required surgery and abnormal findings in both hands."  *Karin R. v.*

---

[12]    Moreover, the ALJ did not address the evidence that Plaintiff's pain was made worse by walking and spending time on her feet, as well as sitting (*see, e.g.*, R. 278, 282, 292, 297, 335, 351, 501, 567), and that her foot pain had improved since she was no longer working and therefore not on her feet as much (R. 567, 572).  This calls into question the ALJ's reliance on the June 27, 2019 examination results, as that examination took place over a year after Plaintiff had stopped working and was not on her feet as much.  (R. 298 (Plaintiff employed at October 6, 2017 visit); R. 335 (Plaintiff no longer employed at February 7, 2018 visit).)

*Saul*, No. 20-CV-1994 (TNL), 2022 WL 980342, at *19-20 (D. Minn. Mar. 31, 2022).

Judge Leung concluded that "like *Combs*, it is not clear what relevance these findings

have to the degree of functional impairment Plaintiff has in her right hand without

exercising medical judgment." *Id.*  The ALJ's reasoning presents the same issue here—

medical judgment is required to determine what effect the objective findings of negative

bilateral straight leg raise tests, normal reflexes in all extremities, and intact range of

motion have on Plaintiff's ability to stand, walk, sit, etc.  *See id.*; *see also Jennifer A. v.

Berryhill*, No. 18-cv-459 (BRT), 2019 WL 569830, at *11 (D. Minn. Feb. 12, 2019)

("There was no way for the ALJ to know whether 'normal movement' and 'no acute

distress' was more consistent with a ten-pound weight restriction than a twenty-pound

weight restriction based on those notes without exercising medical judgment.").

Consequently, the Court remands this case to the Commissioner to determine the

severity of Plaintiff's physical impairments, including, if necessary, conducting further

inquiry into the relevance of Plaintiff's physical examination results to her ability to

function in the workplace, *see Combs*, 878 F.3d at 647, and by considering the

persuasiveness of the prior administrative medical findings in a way that does not result

in impermissible inferences being drawn from the medical evidence, *see Karin R.*, 2022

WL 980342, at *21.

As to Plaintiff's arguments regarding the severity of her mental impairments, the

ALJ's conclusion was based on the state agency consultants' opinions that "[e]vidence in

file suggests the claimant's mental health impairments are nonsevere" and Dr. Wiger's

examination of Plaintiff.  (R. 22 (citing R. 74, 87).)  Plaintiff questions the ALJ's reliance

on Dr. Wiger's opinion because he opined that Plaintiff "relates variably with []

coworkers and supervisors."  (Dkt. 19 at 28-29.)  The Court is not persuaded by this

argument, because the state agency consultants considered Dr. Wiger's opinion

containing this statement when making their findings.  (*See* R. 74, 87.)  Moreover, Dr.

Wiger also opined that Plaintiff could understand and follow directions, sustain attention

and concentration, and handle stressors in an entry level workplace.  (R. 269.)  Thus,

notwithstanding the evidence cited by Plaintiff, the Court concludes that substantial

evidence supports the ALJ's finding of non-severity as to Plaintiff's mental

impairments.[13]  *See Nash*, 907 F.3d at 1089 ("If substantial evidence supports the

Commissioner's conclusions, this court does not reverse even if it would reach a different

conclusion, or merely because substantial evidence also supports the contrary outcome.")

(quoting *Travis*, 477 F.3d at 1040).  However, should the ALJ find any of Plaintiff's

physical impairments severe or the combination of her physical impairments with her

mental impairments severe on remand, the ALJ will be required to consider all

impairments, including severe and non-severe, in combination, when determining

Plaintiff's RFC.  *See* 20 C.F.R. § 404.1545.

**B.     Constitutional Deficiency Issues**

Plaintiff also seeks remand on the grounds that the appointment of former

Commissioner Andrew Saul violated the separation of powers doctrine and accordingly,

---

[13]     Neither party addressed the identification in the initial and reconsideration
determinations of Plaintiff's "Depressive, Bipolar and Related Disorders" and "Anxiety
and Obsessive-Compulsive Disorders" as "Severe." (*See* R. 73, R. 86.)

the ALJ's decision is constitutionally defective because the ALJ derived her authority from former Commissioner Saul.  (Dkt. 19 at 30-33.)  Defendant opposes this argument on several grounds (Dkt. 25 at 5-20), and in her reply brief, Plaintiff agrees that the Court need not reach the constitutional issues if the Court orders remand on other grounds (Dkt. 26 at 2).

"It is the established practice of the federal courts to avoid the decision of delicate constitutional questions if the case presenting them may be disposed of on alternative grounds."  *Beeson v. Hudson*, 630 F.2d 622, 627 (8th Cir. 1980) (collecting cases); *see also O'Brien v. U.S. Dept. of Health and Human Servs.*, 766 F.3d 862 (8th Cir. 2014) (explaining that "the doctrine of constitutional avoidance particularly counsels [the court] not to give unnecessary answers to constitutional questions."); *Wallace v. ConAgra Foods, Inc.*, 747 F.3d 1025, 1029 (8th Cir. 2014) ("It is a foundational principle in our legal system, enunciated by Justice Brandeis in a familiar concurrence, that courts must make every effort to avoid deciding novel constitutional questions."); *Cochenour v. Cochenour*, 888 F.2d 1244, 1245-46 (8th Cir. 1989) ("finding "[w]e need not reach constitutional issues unless required to do so to decide the case.") (citations omitted).  Accordingly, applying the principles stated above, because the Court orders remand on other substantive grounds, the Court does not reach the constitutional arguments raised by Plaintiff.  *See Ernestine L. v. Kijakazi*, No. 1:21CV139, 2022 WL 110240, at *5 (N.D. Ind. Jan. 12, 2022) (citing *Ashwander*, 297 U.S. at 347) ("As this Court has determined that remand is required on the above substantive issues, the Court will invoke the doctrine of constitutional avoidance and not reach the constitutional issue.").  Having

ordered remand on non-constitutional grounds, the Court need not and does not reach the separation of powers issues raised by Plaintiff.

* * *

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Dkt. 18) is granted in part and Defendant Acting Commissioner of Social Security Kilolo Kijakazi's Motion for Summary Judgment (Dkt. 24) is denied.

## V.    ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.      Plaintiff Pamela K.'s Motion for Summary Judgment (Dkt. 18) is **GRANTED IN PART** and **DENIED IN PART**;

2.      Defendant Acting Commissioner of Social Security Kilolo Kijakazi's Motion for Summary Judgment (Dkt. 24) is **DENIED**; and

3.      This case is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 20, 2022                              *s/Elizabeth Cowan Wright*
                                                  ELIZABETH COWAN WRIGHT
                                                  United States Magistrate Judge